| | |
|---|---|
| UNITED STATES DISTRICT COURT<br>SOUTHERN DISTRICT OF NEW YORK | 01 Civ. 7620 (WHP)(MHD) |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Seneca Ins. Co.,

        Plaintiff

   v.

**Plaintiff's Memorandum In Support of its Motion to Strike Defendants' Experts.**

Brent Wilcock and Secure Southwest Brokerage, Ltd.,

        Defendants

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## STATEMENT OF FACTS

A summary of the relevant facts appears in the Memorandum and Order in this action dated May 24, 2002 (Hon. Wm. H. Pauley, USDJ.); in plaintiff's Memo. in Opposition to Defendants' Motion for Partial Summary Judgment, dated June 18, 2004, at pp. 3-5; and in the Memo filed today in support of plaintiff's Motion for Sanctions. Except where relevant, plaintiff does not burden this Honorable Court with repetition of factual recitals.

## ARGUMENT

### THE COURT SHOULD STRIKE DEFENDANTS' PURPORTED EXPERTS.

**A.  The Relevant Legal Standards.**

The expert testimony must meet the requirements of Rule 702, Fed. R. Evid., in order to be admissible. Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 588, 125 L. Ed. 2d 469, 113 S. Ct. 2786 (1993). Such recent cases as Zaremba v. General Motors Corp., 360 F.3d 355 (2nd Cir. 2004) and Nimely v. City of New York, 414 F.3d 381 (2nd Cir. 2005) set out the

well-known tests.  The four main elements that an expert must demonstrate are (1) that a theory or technique can be and has been tested; (2) that it has been subjected to peer review and publication; (3) that it has a low known or potential rate of error; and (4) that it is generally accepted in the relevant scientific community.  Zaremba, 360 F.3d at 358.  The expert must be qualified, and the testimony must in fact assist the trier of fact.  Id. at 359-60.  Nimely also points out that there must be a rigorous connection between the methodology and the expert's conclusions.  Nimely, 414 F.3d at 396.

    Lava Trading, Inc. v. Hartford Fire Ins. Co., 2005 U.S. Dist. LEXIS 4566 (SDNY Feb. 14, 2005) provides an especially pertinent discussion of the problems of expert reports that are rife with inaccuracies and flaws.

**B.  Defendants' Expert Shapiro.**

    At the beginning of  the first policy year of plaintiff's day care center insurance program, 3/1/94-2/28/95, defendants submitted an application[1] on behalf of Kid Express, the informal name for the Tucson Preschool Acad., Inc.  (Ex. 26)  Defendants caused the renewal of the coverage for the second policy year, 3/1/95-2/29/96.  Defendants submitted the applications to Seneca with the word "None" in response to the question about prior "Losses."  Ex. 26, p. 1.

    In fact, Kid Express had had at least four sexual abuse claims with dates of loss before March 1, 1995.  Defendants paid a check to the counsel that they hired to handle two of the cases, Brace and Ordonez, before effecting the second policy year coverage beginning March 1, 1995.  (Ex. 20, Doc 1,001,221, Check No. 1187)  They therefore knew of at least two sexual abuse cases against Kid Express.  Yet they negligently failed to ensure that their clerical

---

[1] Notably, defendants themselves drafted, created, printed and used their own application form.  Seneca had absolutely nothing to do with its preparation or use in any way.

employee, who filled out and submitted the 250-300 day care center applications for coverage (Wilcock 2 Pg: 105 Ln: 21 - Pg: 106 Ln: 17), completed the Kid Express application accurately. Seneca did not know of any of these incidents, would never have insured Kid Express if it had, and would have rescinded any coverage as soon as it found out.  Wolin Aff't re Motions in Limine, ¶ 15-16.

The results were tragic.  Because of the coverage, Kid Express was able to continue operations under Arizona law, instead of being forced to close.  In the summer of 1995 its employees committed at least two further acts of sexual abuse, known as Grogan and Davis. Ultimately, in 2000, Seneca settled the subsequent lawsuits for a total of $1.25 million, and seeks recovery of that amount of damages from defendants.

Defendants now are desperately trying to wriggle out of any obligation that they had to inform Seneca of the incidents.  They focus mainly on whether the cases had to be identified as "Losses" on the application.  [They also claim that defendants knew nothing of any of the sexual abuse cases when the coverage began for each of the two policy years, an issue that must await trial and resolution of credibility issues.  They further contend that defendants had no other statutory, contract or common law obligation to report sexual abuse claims, even if the application is read as they claim, an issue not addressed in defendants' limited summary judgment motion of June 2004, or in these motions.]

Defendants' proposed expert Shapiro submitted a report that is Exhibit 201-IS.  His report focuses on only the Gass sexual abuse incident, which occurred in 1991 and led to a lawsuit filed in 1996.  Shapiro opines that that incident – and he addresses only that one of the four known sexual abuse incidents – did not need to be disclosed on the Kid Express application. His report miserably fails the Daubert and Rule 702 tests.

*****

Plaintiff notes again, as in the Memo in Support of Plaintiff's Motion for Sanctions, that presently pending before this Honorable Court is defendants' limited motion for partial summary judgment, filed in June 2004. That motion refers to the Kid Express application. As of course they must, defendants concede that the application calls for a history of "losses"[2] (Ex. 26, p. 1). Defendants' June 2004 motion seeks a ruling that no claim can be a "loss," such that it must be reported on the Kid Express application, unless the insurer (here, Seneca) has paid out money, or been judged liable. Defendants contend that the Gass case had not reached that stage.[3]

Defendants' limited summary judgment motion never once mentions this expert Shapiro, who comes to a conclusion that in key respects contradicts defendants' contentions in their motion. See, plaintiff's Memo in Opp. to Defendants' Mot. For Partial Sum. Jud., dated June 18, 2004, at 17-19. It appears that defendants have abandoned use of this expert.

If the expert is abandoned, then this Honorable Court need not address his testimony. In case defendants try to offer his testimony, this motion addresses this expert's failure to offer reliable evidence.

*****

The Shapiro Report concludes that a sexual abuse incident is a "Third-Party Claim," which he also called a "Liability Claim." He further states that only a "First-Party" incident can be called a "Loss." Ex. 201-IS, at [unnumbered] pp. 2-3. He concludes on Page 3 of his report that the application did not call for any information regarding "Liability claims," and that a

---

[2] SSB and Wilcock themselves created, printed and used the application, with no involvement whatsoever from Seneca. Defendants, who occasionally contend that ambiguity in forms should be held against the insurer, fail in that argument. When the insurance agency is solely responsible for every aspect of the application, as here, then any ambiguities must be resolved against that agency, which drafted the document.

[3] Defendants' summary judgment papers discuss various issues of fact, especially in relating to the Gass case, such as the extent of Wilcock's purported knowledge of that case's underlying facts. Ultimately, though, the motion focuses on the limited question of law about whether a claim can ever be a loss, and needs to be reported.

sexual abuse claim does not have to be reported as a "loss" on the SSB-created application (Ex. 26). [4]

Numerous problems render his conclusion and report frivolous.  He cites no sources, analyzes no authorities, offers no means of analysis other than his subjective opinion, and in his deposition he retreats from every conclusion he makes.  See, e.g., Shapiro Dep Pg: 59 Ln: 16-19.  (All page and line citations in this Section B refer to the Shapiro deposition, unless explicitly noted.)

*****

Shapiro's theory, to the extent it can be discerned, seems to boil down to this.  (1)  He subjectively believes, based only on his memory, that "insurers generally" use the word "Loss" only to refer to the direct insurer's (here, Kid Express's) suffering property damages;  (2)  the application only called for "Losses" disclosure;  and thus (3) there was no obligation to disclose any sexual abuse incidents, apparently even if they resulted in damages of millions of dollars, because they are exclusively referred to as third-party liability "claims" but never as "losses."  Ex. 201-IS, at 2-3.

This Memo now evaluates the Shapiro Report according to the Daubert criteria.

**1.  Shapiro's Theory Did Not, and Could Not, Undergo Any Verification or Testing.**

Shapiro's theory is that his memory of "general" practices of the insurance industry should control interpretation of the Kid Express application for coverage.  His theory depends on what is in his memory and on what he can recall, and refers only to "general" practices of the

---

[4] Shapiro also concludes that Wilcock's current version of events, which plaintiff vigorously disputes and which seems inherently incredible, showed that Wilcock knew that the event was not sexual abuse, but only a simple mistake by the bus driver in letting a girl sit on his lap. Id. at 1-2.  "Obviously, … Wilcock had no reason to believe that there might … be a claim," the report concludes on this factual issue.

insurance industry. On the basis of this so-called theory, Shapiro concludes that the sexual abuse claims against Kid Express did not have to be disclosed in response to the question for "Losses." This cannot be confirmed or even tested.

As Shapiro discusses his report he first speaks in terms of what "losses" and "claims" are "generally … called." Pg: 7 Ln: 16 – Pg: 8 Ln: 2. He states that his experience causes him to conclude that "generally" his claim/loss distinction is valid, but concedes that there could be a different policy somewhere. Dep Pg: 47 Ln: 18 – Pg: 48 Ln: 25. By the end of his deposition, though, he retreats entirely, finally admitting that "industry people refer to losses and claims interchangeably." Shapiro Dep Pg: 141 Ln: 6-9. This meandering around demonstrates that even his original "data" (his memories of insurance applications over his 40+ years of experience) are unreliable, to the extent that they are data at all.

As support for his conclusion, he relies on only one thing: his experience in the industry. He states that he has seen thousands of liability coverage applications, and he has never seen one that asks for "losses," Pg: 8 Ln: 21 – Pg: 9 Ln: 12. He then retreats to stating that liability applications "usually" ask for claims history. Pg: 9 Ln: 13-17; Pg: 10 Ln: 9-22.

Two other points cast specific doubt on his conclusions, even in Shapiro's own thinking. Shapiro admits that an insurer would want to know information about sexual abuse demands for damages. Pg: 86 Ln: 1-4. He also admits that his conclusion means that the application question was "stupid." Pg: 82, Ln: 13-18. When he learns that defendants created the application, and that he cannot blame Seneca for wording that it never created, Shapiro finally admits that defendants would have no reason to ask for "Losses" on the application instead of losses and claims. Pg: 85 Ln: 22-25.

**2.  Shapiro's Theory Has Never Been in Any Publication or Subject to Any Peer Review.**

Shapiro admits that there is no written source for his theory of self-referential memory excavation.  Pg: 6 Ln: 12 – 25.  He admits that he has never seen any written support for his conclusion.  Pg: 122 Ln: 2 – Pg: 123 Ln: 2.  He even admits that he knows of no court that has accepted his claim/loss distinction.  Dep Pg: 142 Ln: 24 – Pg: 143 Ln: 1.

The absence of any publication, or peer review, shows that no one else even recognizes that Shapiro's subjective opinion – about "general" industry usage controlling this application's construction – is worthy of consideration.

**3.  Shapiro Has No Data on his Theory's Rate of Error, and Contends that it Has No Weaknesses.**  Pg: 143 Ln: 2 – 15.

**4.  The "Theory" Has No Acceptance Within the Insurance Industry.**

Shapiro admits that the industry uses the words "loss" and "claim" interchangeably.  Pg: 59 Ln: 6 – 19.

When discussing the standard, much-used ACORD application, Shapiro admits that the phrase "loss history" (Ex. 202-IS, p.2, at bottom) requires identifying both claims and losses (Pg: 57 Ln: 23 - Pg: 58 Ln: 2), supposedly because of supplemental wording in the next line of the application.  He further admits that directions about a "Loss summary," in the small box on the right-hand end of the first line of that box, require attaching a summary of both losses and claims.  Pg: 58 Ln. 15 – Pg: 59 Ln: 5.  The point is that the ACORD application uses the words interchangeably, again exposing Shapiro's theory to be false.

Defendants' limited motion for partial summary judgment addressed exactly this issue of the supposed loss/claim distinction.  Plaintiff's Memo of Law in Opposition, dated June 18, 2004, lays out the contradiction between industry usage and defendants' supposed construction.  Memo. at 6-15, 16-19.  That Memo also sets out the contradiction between the defendants' argument in that motion, and Shapiro's assertion in his testimony.

Shapiro also admits that the supposed loss/claim distinction does not appear in Seneca's required filings with the New York Insurance Department.  Pg: 75 Ln: 9 – Pg: 81 Ln: 25.

Shapiro has no support whatsoever for his proposition that the "generally"-observed loss/claim distinction even exists, much less that it is accepted in governing how the Kid Express must be construed.

### 5.  Shapiro Has No Relevant Qualifications Whatsoever.

Shapiro's one-page CV, Drummond Aff't Ex. C, reflects no expertise or special learning supporting his legal conclusion about the Kid Express application and its use of the word "Losses."  His experience, according to the CV, relates to risk management, cost reduction, acquisitions, and department management within a brokerage firm.  The CV shows no experience in drafting application forms or policies themselves, or in working with industry leaders in their wording.  Shapiro has apparently not even testified in any cases involving his vaunted claim/loss distinction.  Pg: 147 Ln: 2 – Pg: 148 Ln: 2.

### 6.  Does the Testimony Assist the Trier of Fact?

Plaintiff contends that the report and testimony do not assist this Honorable Court as expert analysis.  Shapiro's "general" industry usage (Ex. 201-IS at p. 2, third paragraph from the

bottom) does not even refer to a construction that would control the meaning of the Kid Express application. At best, Shapiro offers lay testimony about an insurance executive's memory of what has come across his desk over the years, without any reason to believe that his memory of that "general" usage should control the construction of the particular wording of a specific application.

**7. There Is No Rigorous Connection Between the Methodology and Shapiro's conclusions.**

Shapiro's "methodology" on its own is not rigorous. The "methodology" simply involves Shapiro's subjectively looking into his memory and pulling out his view of "general" industry usage. There is no connection at all between what he claims, to the extent it can be considered a "methodology" at all, and his conclusion that the Gass sexual abuse case does not need to be disclosed on the Kid Express application.

**B. Defendants' Expert O'Grady.**

Defendants offered Edward O'Grady as a financial expert to present conclusions concerning the SIR Fund and claims payments. The two-page O'Grady Report is Ex. 202-EO. To the extent the report can be understood, O'Grady seeks to draw conclusions that attempt to cast doubt upon Seneca's claimed damages relating to the SIR Fund.

O'Grady's report appears to start out with financial data that, as will be shown below, was mostly prepared by defendants and is of dubious if any reliability. Ex. 202-EO, Pg. 2, top half. He uses those figures to show, supposedly, amounts that the SIR Fund could have available for paying policy claims. Then he sets out certain calculations that supposedly summarize the amounts that Seneca seeks for two of the three policy years. Pg. 2. Finally he refers to another

amount, incorrectly claiming that it was calculated by Seneca, saying that knowledge about the sources of that amount might change his figures. Pg. 2, at end.

*****

O'Grady's data, though, are utterly unreliable. First, O'Grady states that he is, in essence, accepting figures that he believed were prepared by Seneca. O'Grady Report, Ex. 202-EO, at Pg. 1, last para.; Pg. 2, penultimate para. O'Grady learned at the deposition that the defendants themselves prepared Ex. 205-EO. Already he had to admit that those numbers therefore had less weight. Pg: 15 Ln: 2-11; Pg: 69 Ln: 1-6.

O'Grady admitted that he had used Exs. 205-EO and 206-EO without any backup data or information. He directly admitted that the table at the top of page 2 only reflected numbers from Ex. 205-EO and Ex. 206-EO. Pg: 73 Ln: 7-10. Since Ex. 206-EO only reflects payments out of the SIR Fund relating to claimants or to ACCA itself, then it is clear that O'Grady's table on p. 2, top, draws its income and "fees" figures from Ex. 205-EO.

As one stark example of unreliability, O'Grady asserts on the second page of his report, Ex. 202-EO that the SIR Fund paid claims of $42,297 in policy year 3/1/95-2/29/96. Yet plaintiff's expert James Carey shows that, from the policy year 1995-1996 SIR Fund contributions, the SIR Fund properly paid $20,897 to Seneca claimants, improperly paid $24,595 to Scottsdale-years insured claimants, and paid $36,166 in undocumented claims payments, for total payments out of over $80,000. Ex. Carey-1, Schedule 15.

Evidence is overwhelming that SSB did not observe any reasonable accounting practices concerning claims payments, SIR Fund records, or fees to SSB. Plaintiff contends that the SSB-prepared Ex. 205-EO was essentially made up by a person sitting at a typewriter with hardly any source documents.

In one of the more egregious examples of poor financial practices, SSB apparently kept the post-1993 SIR Fund bank account records only on a handwritten sheets of paper. Ex. 21, Docs. 1,001,258 – 269. When a check bounced in the SIR Fund – showing the chaos in the records, of course – it appears that the hand-written balance never was adjusted upwards. Check 1200, Ex. 20, Doc. 1,001,229, is a simple example. The handwritten checkbook subtracts the $3,419.23 from the balance. Ex. 21, Doc. 1,001,263. After the check bounced, however, no correcting balance entry appears.

Another unreliability lies in the supposed fees to SSB. There has never been any indication that Wilcock was entitled to take a fee from the SIR Fund itself according to his contract with Seneca. Yet he claims it now: <u>see</u>, "Fee to SSB" column, Ex. 205-EO. O'Grady admits that he did not know whether SSB was entitled to significant fees from the SIR Fund. Pg: 16 Ln: 4 – 16. In the handwritten checkbook, Ex. 21, there are no deductions for fees payable to SSB, raising significant questions of how, to whom, or if the fees were ever paid. Without the destroyed SSB general account checkbook, of course, payments could have come from the commingled funds with no way of tracking them now. The accuracy challenges are endless.

O'Grady simply accepted the figures in Ex. 205-EO on faith. Yet even he has to admit that he would ordinarily look for backup documents. Pg: 74 Ln: 6-13. He would look for bank documents to confirm his figures. Pg: 28 Ln: 17-24. He would have to see the general ledger. Pg: 90 Ln: 9 - Pg: 91 Ln: 2. He did not remember asking for a single record of any kind. Pg: 58 Ln: 11-17.

Additionally, as demonstrated in plaintiff's contemporaneous Motion for Sanctions, none of the SSB general account documents survived defendants' destruction. Confirming work is impossible.

*****

The traditional <u>Daubert</u> analysis now further demonstrates that O'Grady's testimony should be precluded in its entirety.

**1.  Testing or Verifying O'Grady's Theory Fails.**

O'Grady's theory seems to be that it is acceptable to review some numbers provided by unreliable actors, and make calculations that supposedly have use before the Court.  O'Grady flatly admitted that his work is reliable only if the data is reliable. Pg: 83 Ln: 8-14.  O'Grady's theory fails.

**2.  O'Grady Could Not Cite Any Publication Support for his Work.**  Pg: 79 Ln: 23 – Pg: 80 Ln: 7.

**3.  O'Grady Had no Support in Terms of Testing His Theory.**

The concept that he was applying a theory did not ever appear to occur to him.  He of course had no assessments of reliability, error rates or weaknesses of his "methodology" of taking unreliable data at face value and performing limited calculations.

**4.  No Acceptance in the Relevant Community.**

O'Grady tries to evade questions about the relevant community, and finally claims that his use of unconfirmed numbers "happens," a minimal assertion at best. Pg: 78 Ln: 1 – Pg: 80 Ln: 20.  He offers no other support from the accounting, auditing or insurance communities.

**5.  O'Grady Is Not Qualified.**

O'Grady admits that he only did one single fraud audit in his 43 years of boasted experience.  Pg: 20 Ln: 14 – Pg: 21 Ln: 18.  He does not even remember if he tried to look at all the documents that he could obtain in that case.  He resisted even discussing what a fraud investigator would try to obtain in a forensic audit, finally admitting that it's possible one would try to get copies of all the documents made available.

O'Grady's expertise may be in preparing audit opinions.  As to forensic investigations, though, his experience is essentially nil, and even his CV, Ex. 201-EO, does not reflect any experience that is useful to this Court.


**6.  This Testimony Is Not Useful.**

O'Grady essentially admitted that his expertise brought no special value to what he did. Pg: 69 Ln: 19 – Pg: 70 Ln: 16.  Pg: 73 Ln: 7-16.  Pg: 82 Ln: 19 - Pg: 83 Ln: 1.  With the unreliability clear, O'Grady's testimony appears to have no use to this Honorable Court.


**7.  The Supposed Methodology Does Not Connect to the Conclusions.**

O'Grady's "methodology," such as it is, is to accept a small set of figures, not ask who calculated them, not confirm or verify them in any way, and then perform a few calculations that neither require expertise nor result in figures that are reliable in any way.

It is not easy to identify O'Grady's conclusions from his report, Ex. 202-EO.  He appears to be stating that some money would be left available to pay claims from the SIR Fund, or perhaps not, depending on what further financial information might be available.  Plaintiff is not able to hypothesize any issue in this case to which this "conclusion" relates.

There may be a connection between the highly dubious methodology and the vague, unidentifiable conclusions in that neither bears any credibility.  Otherwise, the connection hardly appears rigorous at all.

*****

O'Grady did confirm one thing in his deposition.  SSB has admitted using SIR Fund contributions collected in one policy year to pay claims that occurred in a different policy year.  O'Grady confirms that that practice is improper.  This admission by a party representative is relevant to certain Wilcock claims concerning what Wilcock did, and plaintiff expects to use certain aspects of his testimony in cross-examination of defendants.

## Conclusion.

Both of defendants' experts dramatically fail the standards of Rule 702, Fed. R. Evid., and of Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 588, 125 L. Ed. 2d 469, 113 S. Ct. 2786 (1993).  This Honorable Court should strike their testimony and preclude their testifying.


Dated: New York, NY
September 30, 2005

                                                                          /s/
                                        Jeffrey N. Drummond  (JD3182)
                                        Attorney for plaintiff
                                        303 W. 21st St.
                                        New York, NY  10011
                                        (212) 352-9861